IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 10, 2017 Session

**STATE OF TENNESSEE v. ANTHONY M. CRAWFORD**

**Appeal from the Criminal Court for Wilson County**
**No. 13-CR-142    John D. Wootten, Jr., Judge**
_____

**No. M2015-02426-CCA-R3-CD**
_____

A Wilson County jury convicted the Defendant, Anthony M. Crawford, of aggravated assault and child abuse.  The trial court sentenced the Defendant to consecutive prison terms of six and four years, for a total effective sentence of ten years.  On appeal, the Defendant asserts that: (1) the trial court erred when it denied his motion to dismiss the indictment on double jeopardy grounds; (2) the trial court improperly commented on the evidence; (3) the trial court erred when it precluded the Defendant's expert witness from testifying at the suppression hearing; (4) the trial court erred when it denied the Defendant's motion to suppress his October 19, 2012 statement; (5) the evidence is insufficient to support the convictions; (6) the trial court erred when it allowed the State to cross-examine witnesses about "highly prejudicial statements" the Defendant made about the victim; (7) the State did not properly make an election of offenses, thus depriving the Defendant of a unanimous verdict; (8) the cumulative effect of the errors deprived the Defendant of a fair trial; and (9) the trial court improperly ordered consecutive sentencing.  After a thorough review of the record and applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., J., joined.  THOMAS T. WOODALL, P.J., concurred in result only and filed a separate concurring opinion.

Andrew Love and Barry Gearon, Nashville, Tennessee, for the appellant, Anthony M. Crawford.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Tom P. Thomson, Jr., District Attorney General; and Thomas H. Swink, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
## I. Facts
### A. Procedural History

A Wilson County grand jury indicted the Defendant for two counts of aggravated child abuse. The victim was his girlfriend's two-month old baby. The Defendant filed a motion to suppress his statement made to police on October 4, 2012, at Vanderbilt Hospital, and a separate motion to suppress his statement made to police on October 19, 2012, after undergoing a polygraph test at the police station. After a hearing, the trial court determined that both statements were voluntarily made and denied the motions to suppress the statements.

The Defendant also filed a motion in limine requesting that the State not be allowed to mention the polygraph test at trial. The trial court granted the motion. On October 21, 2014, the first trial in this case began. After the State had presented proof, the Defendant presented an expert witness who mentioned that, in the course of the investigation, the Defendant had taken a polygraph test. Upon mention of the polygraph test, the trial court excused the jury and talked with both attorneys. The trial court asked the attorneys for suggestions on ways to address the issue of the jury's hearing about the polygraph test. Neither attorney offered any constructive suggestions. The trial court declared a mistrial on October 22, 2014.

On January 28, 2015, the Defendant filed a motion to dismiss the indictment on double jeopardy grounds based upon the October 22, 2014 mistrial. After a hearing, the trial court denied the motion and denied the Defendant's request for an interlocutory appeal. At the second trial, the jury found the Defendant guilty of the lesser-included offenses of aggravated assault and child abuse. The trial court sentenced the Defendant to consecutive prison terms of six years and four years, for an effective sentence of ten years.

### B. Suppression Hearing

The Defendant contended in his suppression motions that both the October 4 statement and the October 19 statement were obtained through police coercion. On appeal, the Defendant challenges only the voluntariness of the October 19 statement. We will summarize all the testimony from the suppression hearing as the entire progression of the investigation is relevant to this issue.

October 4, 2012 Statement

2

Scott Massey, a Lebanon Police Department detective, testified that he received a phone call on October 4, 2012, from a Department of Children's Services ("DCS") case worker. The case worker advised that Vanderbilt Children's Hospital had notified DCS about a possible two-month-old child abuse victim, who had several fractures.

At Vanderbilt Hospital, Detective Massey and Detective Donnie Self met in the emergency room with Dr. Meredith, the attending physician. Dr. Meredith described the multiple fractures throughout the victim's body that were in various stages of healing. Based upon the initial assessment, the victim's case had been transferred to Dr. Deborah Lowen, the head of the child abuse team at Vanderbilt Hospital.

Detective Massey testified that he next spoke with the victim's mother, N.S., who relayed the victim's history to Detective Massey. N.S. told the detective that she was thirty-two weeks into her pregnancy when the victim was born on July 31, 2012. Due to his premature birth, the victim remained in the hospital until August 31, 2012. After release from the hospital, the victim had weekly medical appointments with the pediatrician. N.S. told Detective Massey that, two days before his hospitalization, the victim had been "vomiting." N.S. took the victim to his pediatrician, and the pediatrician instructed her to take the victim to "Vanderbilt." At the hospital, the victim was diagnosed with "acid reflux," given a prescription, and sent home. Two days later, October 4, 2012, the vomiting persisted. N.S. said that she called the pediatrician, and the pediatrician again advised N.S. to take the victim to "Vanderbilt" for assessment.

Detective Massey testified that N.S. told him that she lived at Value Place, an extended stay hotel on Highway 109, and worked full-time in housekeeping at the hotel. The Defendant lived with her and the victim, and the Defendant had been "babysitting" on October 4 while N.S. worked. When the pediatrician advised her to take the victim to Vanderbilt Hospital on October 4, she and the Defendant took him. N.S. said that she requested x-rays of the victim in an attempt to learn what was wrong with the victim. It was following these x-rays that N.S. learned of "all of the broken bones." Detective Massey described N.S. as "visibly upset." She told Detective Massey that she was mad at being accused by Vanderbilt Hospital personnel of harming her child when she had "not done anything to hurt [the victim]."

Detective Massey testified that he told N.S. that he was "trying to figure out exactly what happened" to the victim, a two-month old that had "many broken bones" with no explanation. He asked her to explain her "home life." N.S. said that the Defendant was her boyfriend and "stay-at-home babysitter." She explained that she worked six days a week, eight hours a day. She tried to work ten and twelve-hour days for the overtime money, so having the Defendant watch the victim was helpful to her. She said that the Defendant was not the victim's biological father but that she and the

Defendant "had been together since she was pregnant." N.S. confirmed that she and the Defendant were the only people who took care of the victim. She explained that they would go to the Defendant's mother's house on Saturday nights for "family night" where the whole family would be together but that the victim was with N.S. and the Defendant the entire time.

N.S. told Detective Massey that the victim slept, swaddled, in his "swing." She had found that he slept better in his swing than his crib. She described the victim as having been "really fussy lately." Consequently, she and the Defendant had not been able to sleep much. N.S. adamantly denied doing anything to harm the victim. N.S. also denied that the Defendant had done anything to harm the victim. She said the Defendant treated the victim as "his own son."

Detective Massey testified that, on the night of October 4, 2012, Vanderbilt Hospital was "extremely busy" and there were no rooms available for him to speak privately with N.S. Their conversation took place on the benches outside the hospital, in front of the emergency department entrance. Detective Self was eight to ten feet away from Detective Massey and N.S. while the two spoke. Detective Massey estimated that the interview lasted for an hour, beginning at 9:20 p.m. Detective Massey then asked if he could speak with the Defendant since he was the primary caregiver. N.S. said that the Defendant and his mother were outside smoking, and then she called the Defendant's mother's cell phone. Once N.S. made contact with the Defendant, Detective Massey asked if he could speak to the Defendant on the phone. He identified himself to the Defendant and asked if the Defendant would meet with him to speak about the victim's injuries. The Defendant agreed and approximately a minute later the Defendant approached Detective Massey from the parking garage.

Detective Massey testified that he invited the Defendant to sit on the bench with him while they spoke. He said that it seemed "kind of informal" to him at that point and that the Defendant did not appear "to have a problem with coming over and talking" with the detective. Initially, Detective Massey gathered background information to see if the Defendant's information was consistent with the information N.S. had provided. The Defendant described his living arrangement with N.S. and his daily routine with the victim. He agreed that he had not been sleeping well lately due to the victim's fussiness. The Defendant told Detective Massey that he had been unaware that the victim had been "hurt." He stated that he thought of the victim "as his own son" and would not harm him.

Detective Massey testified that he suggested to the Defendant that the lack of sleep might cause the Defendant to be "short tempered" with the victim. The Defendant acknowledged that it was difficult dealing with the victim at times but maintained that he would never harm the victim. As the two men spoke, Detective Massey observed that the

4

Defendant appeared distraught at times, concerned, and tired. The Defendant responded appropriately to all of the detective's questions, and he did not appear to be under the influence of an intoxicant. The tone of the interview was conversational, and Detective Massey said that he never raised his voice or told the Defendant he was not free to leave.

Detective Massey testified that when he questioned the Defendant further about possible sources of the injuries, the Defendant stated that he accidentally dropped the victim one time. He explained that the victim had been home from the hospital for about a week. The Defendant had retrieved the victim from the bathtub and was walking to another room when the victim slipped out of his hand, landed on a mattress, and then bounced off of the mattress onto the floor landing on his face. The Defendant said that the victim began crying. The Defendant said he immediately picked the victim up, patted him, and the victim stopped crying. The Defendant said he thought it was "okay," so he did not tell N.S. because he was afraid she would be angry. The Defendant agreed that there had been times he was aggravated when he picked the victim up but that he never did so with such force that he would have injured the victim.

Detective Massey testified that the Defendant also told him that the victim had been constipated. The Defendant explained a method the pediatrician had suggested for helping the victim with bowel movements that involved gently pressing the victim's legs toward his chest. The victim had cried at times while the Defendant pressed on his legs, but the Defendant assumed it was due to the discomfort of constipation.

Detective Massey wrote down the Defendant's statement and then reviewed the statement with the Defendant. After review, the Defendant signed the two-page statement. Detective Massey estimated that his interview with the Defendant lasted approximately one hour and fifteen minutes.

After speaking with the Defendant, Detective Massey went back inside the hospital where the social worker showed him a photograph of two small marks on the back of the victim's legs. Detective Massey asked N.S. about the marks. N.S. said that they had recently been in the car for eight hours and that perhaps the marks had come from the prolonged period of time in the car seat.

Detective Massey testified that he had mentioned the possibility of a polygraph test to both the Defendant and N.S. during each of their interviews at the hospital. He explained to them that in cases where there is a non-verbal victim, "there may be an offer of a polygraph down the road." He then asked if they would be willing to take a polygraph test, and they agreed.

The following day, Detective Massey called Dr. Lowen seeking an update on the victim's status. Dr. Lowen confirmed that she had completed an initial examination and, in her professional opinion, the victim's multiple bone fractures were the result of child abuse. Dr. Lowen noted that the victim "may have a mild bone disease" but nothing that would explain the extent of the victim's injuries. Further testing was being conducted, and Dr. Lowen estimated that she would have the results in approximately eight weeks.

On cross-examination, Detective Massey confirmed that his interaction with the Defendant at the hospital was "information gathering." Detective Massey stated that, at the point of the initial interview, he did not have enough information to determine the source of the injuries. He agreed that he did not have probable cause to hold the Defendant. Detective Massey said that it was his practice to begin every non-custodial interview by telling the person, "you don't have to talk to me if you don't want to." He confirmed that he said this to the Defendant at the beginning of the initial interview.

The trial court then ruled on the motion to suppress the October 4, 2012 statement to police. The trial court denied the motion, finding that the interview was non-custodial. The trial court credited the detective's testimony that he advised the Defendant that he was not under any obligation to speak with the detective. The trial court further found that the location, which was outside in a high-traffic area, the fact that the Defendant was not the focus of the investigation, and the conversational tone of the interview supported the detective's testimony that this was the information gathering phase of the investigation. The trial court concluded that the statement was voluntarily given and non-custodial.

### October 19, 2012 Statement

Detective Massey testified that he arranged for the Defendant and N.S. to take a polygraph test on October 19, 2012. The Defendant and N.S. arrived at the police station at 10:00 a.m. The Tennessee Bureau of Investigation ("TBI") polygraph examiner had just arrived, so Detective Massey asked the Defendant and N.S. if they would wait in the lobby while the polygraph examiner set up his equipment. TBI Special Agent Mike Smith and Tennessee Highway Patrol ("THP") Agent Larry Pollard conducted the test. Detective Massey walked the Defendant upstairs to the room where the polygraph equipment had been set up, an area that required key card access for building security.

Detective Massey testified that initially Special Agent Smith and Agent Pollard gathered personal information from the Defendant. Detective Massey recalled that each man wore a suit and a tie. He described his dress that day as "typical," a polo shirt, cuffs, and a badge. Detective Massey listened as Special Agent Smith and Agent Pollard reviewed the process of taking a polygraph test with the Defendant. The Defendant

6

appeared to understand their explanations and responded appropriately to any questions asked. Detective Massey testified that the Defendant did not appear to be impaired and was alert. The Defendant reviewed and signed both a polygraph waiver and a *Miranda* waiver. When provided with the option, the Defendant declined to have the exam video-recorded.

Detective Massey estimated that this initial conversation with the Defendant lasted between twenty and twenty-five minutes. He described the tone of this introductory conversation as "very relaxed." Detective Massey asked the Defendant if he wanted a break before they began the test, and the Defendant indicated that he did. Detective Massey obtained a cigarette for the Defendant, and the Defendant smoked outside the building. Detective Massey stood with the Defendant during the break and the two engaged in "general conversation" and spoke of nothing related to the case. After washing his hands, the Defendant returned to the interview room and began the test. Detective Massey left the Defendant with Agent Pollard and entered a connecting room where he observed via closed circuit television.

Detective Massey testified that the test began at noon and the results were given to the Defendant at 1:21 p.m. After the Defendant had finished the test, he had a fifteen or twenty minute break before receiving the results. While outside on this second break, Detective Massey asked the Defendant how he felt about the test. The Defendant appeared "kind of nervous" but responded that he had told the truth and was not worried. He stated, "I just want my little turd back." Detective Massey clarified with the Defendant that the Defendant was referring to the victim in this statement. The Defendant then said he hoped to marry N.S. and raise the victim "as any responsible parent would." After finishing his cigarette, the Defendant wanted to see the results of the exam, so Detective Massey walked him back upstairs to the interview room.

Detective Massey testified that the Defendant was provided with the questions he would be asked during the polygraph test before the test began. After the break, the polygraph examiner told Detective Massey that the results of the polygraph test indicated that the Defendant had been untruthful about hurting the victim and also about his knowledge of who hurt the victim. In the interview room, Detective Massey told the Defendant the results of the test indicated that the Defendant had not been truthful. The Defendant maintained that he had told the truth during the exam. Detective Massey and Agent Pollard reiterated that he had "clearly failed the polygraph," and the Defendant began crying.

Detective Massey testified that the Defendant admitted that on one occasion, while N.S. was at work, the victim began crying. The Defendant was aggravated and picked the victim up "with one arm and was squeezing him." The Defendant realized he was

7

being "too rough" with the victim, so he laid the victim on the bed and "patted his butt" until the victim fell asleep. The Defendant also recounted an incident when he was "taking a bath" and had shampoo in his hair when he heard the victim scream. He ran to where the victim was and saw that the victim had spit up and was choking. The Defendant said that he grabbed the victim "squeezing him with one hand," while trying to put on underwear with his other hand. The Defendant stated that those were the only two incidents where he felt he had hurt the victim. The Defendant reduced both of the incidents to writing. Detective Massey identified the October 19, 2012 statement. He read both aloud, and they were consistent with his testimony. The Defendant later admitted to a third incident that had occurred, and the Defendant's statement concerning the incident was as follows:

> I, [the Defendant], was asleep. After [N.S.] went to work, the baby started crying while I was asleep, so I got aggravated and got up and grabbed him and squeezed him. I heard a little pop, and I said to myself, what was that? It didn't seem to bother the baby so I didn't think nothing of it so we laid down. I patted his butt to get him back to sleep and we fell asleep.
>
> I didn't call anyone because I was afraid of what might happen and I thought it was just a bone popping.

Detective Massey testified that after the Defendant reduced all of the incidents to writing, he reviewed the statement with the Defendant. The review of the statement was recorded, and the recording was played for the trial court.

Detective Massey denied using threats, coercion, or promises to get the Defendant to take the polygraph exam. He repeated that he had mentioned the possibility of a polygraph test to both N.S. and the Defendant on October 4, 2012, at the hospital and then spoke with N.S. by phone to arrange a time and day for the test. Detective Massey testified that N.S. also took a polygraph test two weeks after the Defendant's polygraph test. N.S.'s polygraph test results indicated that she was being truthful about these events.

On cross-examination, Detective Massey denied any knowledge of the Defendant's medical conditions or that the Defendant was taking medication at the time of the polygraph test. Detective Massey stated that he did not ask the Defendant if he was using medication because the Defendant appeared "pretty sharp and concise." Detective Massey stated that he had no reason to believe the Defendant was under the influence of medication.

8

The Defendant testified that in September and October 2012, he suffered from kidney stones, a cyst on his testicles the size of a grape, and "epididiyitis," which he explained was a "testicle disorder."[1] Due to these medical conditions, the Defendant was taking hydrocodone, phnergan for nausea, and "a couple of different antibiotics and things." The Defendant confirmed that he was having difficulty sleeping as a result of his medical condition.

The Defendant testified that he first met Detective Massey at Vanderbilt Hospital on October 4, 2012, and next saw him at the Lebanon Police Department on October 19, 2012. The Defendant said that he had not slept the night before the polygraph test due to stress and pain from the kidney stones. The Defendant confirmed that he informed someone "at the polygraph" that he had not slept, was in pain, and was taking pain medication. He estimated that he was at the police station for four to six hours. He recalled that when he told "everyone" that he was "under the influence of prescription narcotics and [he] hadn't slept in several, several days," he was told "it didn't really matter and just set it all up and [he] did it."

The Defendant testified that he was at the police station for four to six hours. When he arrived, he waited for about an hour while law enforcement set up the equipment. He said that, even though he notified "them" of his pain medication and lack of sleep, he was still hooked up to the polygraph machine. After the polygraph test, the officers showed him a chart on a computer screen, which he did not understand, and told him that he had lied. The Defendant agreed that he then gave another statement. He said that he felt "trapped" and "scared" during the interview. He recalled that he was twenty-one or twenty-two at the time and alone with three "grown men."

The Defendant was asked about his mental health, and he responded that he had been diagnosed with post-traumatic stress disorder related to his childhood. He stated that he was a victim of abuse and attended twenty-nine different schools as a child. The Defendant stated that he had a ninth-grade education.

The Defendant testified that he felt like he "had been led down a road" to give the second statement after the polygraph test on October 19, 2012. He explained that the portion of the interview that was not recorded was "them calling me a liar a thousand times." He stated that it was his belief that law enforcement tried to "make" him believe he had caused the victim's injuries. The Defendant said that, during the polygraph test the examiner kept advising him to be quiet, other than to offer one-word responses to the questions, and to not move. The Defendant explained, "You passing kidney stones, how

---

[1] Epididymitis is a medical condition characterized by discomfort or pain of the epididymis, a curved structure at the back of the testicle.

can you help but to move, when I'm passing kidney stones and I've got a kidney stone going down through my urethra and my heart gets to racing and I'm hurting." When he attempted to tell the polygraph examiner about his pain due to passing a kidney stone, he was told "it didn't really make a difference." The Defendant said that a very small portion of his time while at the police station was recorded.

On cross-examination, the Defendant testified that he had not slept for "a minimum of four" days before the polygraph test was administered. He agreed that he had been awake for approximately ninety-six hours. He reiterated that he notified law enforcement that he had not slept for four days and was under the influence of narcotics, but that he was told that "it wouldn't make a difference on the polygraph test." He said that he was unsure of whether Detective Massey was in the room at the time he disclosed this information but that he was certain "the TBI agents" were present. The Defendant stated that he volunteered this information to the law enforcement officers.

The Defendant testified about the polygraph test and the procedure for preparing for the polygraph test. He agreed that he had done some research on polygraph testing before taking the test. He said that he learned that a polygraph test was inaccurate 60% of the time. The Defendant said that he did not ask the examiners about this statistic he had gathered from a Google search of the internet. The Defendant confirmed that he was advised of his *Miranda* rights and identified his signature on the waiver. He said that he "vaguely" recalled the information on the form and could not recall whether the form was read to him. The Defendant agreed that he elected not to record the administration of the polygraph test. The Defendant also agreed that although he was passing a kidney stone, had not slept in four or five days, and was taking hydrocodone at the time, two years later he was able to recall that day in detail.

Michael Smith testified that he formerly worked for the TBI and was present on October 19, 2012, when a polygraph test was administered to the Defendant. He explained that Sergeant Larry Pollard, a THP patrolman, was "serving his polygraph internship under [Mr. Smith's] supervision at the time." Sergeant Pollard administered the polygraph test while Mr. Smith assisted Sergeant Pollard with the polygraph post-test interview and supervised Sergeant Pollard during the examination.

Mr. Smith testified about the different "phases" of a polygraph test. One of the phases involved a "suitability assessment" of the examinee. Mr. Smith said that someone would not be a suitable candidate if they had certain health conditions or mental health issues and that behavioral concerns are considered as well as "education, drugs, alcohol, things of this nature." Mr. Smith said that someone with an active kidney stone would not be a good candidate for a polygraph test. He confirmed that a standard question of an examinee before the test begins was whether they had ingested either alcoholic beverages

10

or any type of drug in the prior twenty-four hours. Mr. Smith agreed that narcotic medication could "[i]ndirectly" affect the test.

Mr. Smith testified that, if the Defendant had been determined not suitable, they would not have administered the test. He stated that he had never had someone disclose morphine use on the morning of the test, but, if that were to occur, he would assess the person at the time based upon their mental and physical state.

Mr. Smith testified that the Defendant's answers to three pertinent questions on the examination indicated deception. Mr. Smith denied telling the Defendant that he "might just get counseling" or that "he could be charged with misdemeanor assault." Mr. Smith stated that he believed that he told the Defendant that any decision with regard to charging an offense was the district attorney's decision. Mr. Smith explained that the results of a polygraph test are used as an investigative tool to assist law enforcement in obtaining truthful statements.

On cross-examination, Mr. Smith testified that he would not administer a polygraph test to someone passing a kidney stone. Mr. Smith said that when talking with an examinee about results indicating deception, he did not "normally" use the term "liar" because it put the examinee on the defensive. Instead, he used language like "you haven't been truthful or you haven't told the whole truth."

Following Mr. Smith's testimony, the trial court made specific findings with regard to whether the Defendant had shown coercion and concluded that he had not. Based upon its finding that the Defendant had failed to show coercion, the trial court denied the Defendant's request to present an expert witness on susceptibility to coercion. The trial court further found that the October 19, 2012 statement was given voluntarily. Although finding no coercion, the trial court allowed, as an offer of proof, the testimony of Dr. Stephen Montgomery, a forensic psychiatrist.

Dr. Montgomery testified as an expert in the field of forensic psychiatry. Dr. Montgomery conducted a two-hour forensic psychiatric evaluation of the Defendant. During this time, Dr. Montgomery administered the Gudjonsson Suggestibility Scales to determine the Defendant's susceptibility to coercion. Dr. Montgomery noted that he was concerned about how the Defendant would do with the test because he had repeated the ninth grade three times and never graduated from high school. The Defendant, however, did "fairly well," scoring better than the "average of court-related persons but a little less than average compared to a population of prisoners." Dr. Montgomery stated that the Defendant did "okay" on the delayed memory recall.

Dr. Montgomery testified that, after viewing the video of the Defendant's interview, he believed various techniques offering "face saving justifications" or rationalizations were employed. He said that studies have indicated that persons who are younger, less educated, and have lower intellectual functioning are more susceptible to those techniques. He also testified that the length of an interview is a factor. Dr. Montgomery stated that the interview he observed between law enforcement and the Defendant was "significantly more controlled" than an interview he might conduct with a client. He said that open-ended questions allow for a more "free-flowing narrative" versus closed-ended questions where "we're really more directing at what we're thinking about instead of what their about." Dr. Montgomery observed that law enforcement used "more restrictive" questioning rather than allowing for a "free-flowing account."

Dr. Montgomery testified that the Defendant disclosed to him numerous medical issues that he was suffering from at the time of the polygraph test. Dr. Montgomery stated that he had reviewed medical records corroborating the Defendant's assertion.

On cross-examination, Dr. Montgomery confirmed that the Defendant had been prescribed a "relatively low dosage" of Lortab, "as needed," for pain. He was to take the medication "as-needed." Dr. Montgomery stated that the Defendant did not disclose to him that he had told law enforcement about the medication or the kidney stone. Dr. Montgomery's report stated: "overall, [the Defendant]'s pattern of responding on these measure[s] suggest that [the Defendant] may be more suggestible and compliant than the average person, court-referred individual, or prisoner." Dr. Montgomery explained that his "fairly equivocal" assessment that the Defendant "may" be more suggestible is due to the fact that he only administered one test and he "would never hang [his] hat on just these one scores."

On redirect examination, Dr. Montgomery testified that the Defendant disclosed that, during the polygraph test, he felt "like he was in jail," and that he was not free to leave the police station.

## C. Trial

On June 23, 2015, the Defendant's second trial began. Detective Massey testified consistently with his testimony from the suppression hearing. Additionally, he testified that the Defendant was "very coherent, very clear" and did not appear to be in any pain during the October 19 interview.

Deborah Lowen, a Vanderbilt Children's Hospital pediatrician, testified as an expert witness in the field of pediatrics and child abuse pediatrics. Dr. Lowen stated that her specific title at Vanderbilt Children's Hospital was the Director of the Center for

12

Child Protection and Well Being, the child abuse program. While serving in this capacity, she came in contact with the victim. Dr. Lowen explained that the victim was born at Vanderbilt Hospital, prematurely, and stayed in the Neonatal Intensive Care Unit ("NICU") for the first month of his life before discharge in "good condition." Dr. Lowen testified that during his initial stay in the hospital after birth, the victim underwent head ultrasounds, a chest x-ray, and multiple x-rays of his abdomen. All of these, specifically the x-rays of the abdomen depicting the victim's lower ribs, looked "fine."

Dr. Lowen testified that, after release, the victim had "several visits in a couple of different clinics," and two emergency room visits, including one where she became involved. The victim's primary care physician referred the victim to Vanderbilt Hospital on October 2, 2012, due to vomiting and concern regarding the possibility of pyloric stenosis. The victim underwent an ultrasound to look for pyloric stenosis, which was negative, so he was diagnosed with reflux and released with medication. On October 4, 2012, the victim returned to Vanderbilt Hospital due to concern about him vomiting blood and not keeping food down. Based upon these concerns, an x-ray was taken, which revealed rib fractures. Further chest x-rays showed multiple rib fractures, and the emergency department team requested Dr. Lowen's involvement.

Dr. Lowen testified that she reviewed the x-rays, spoke with the caregivers individually, examined the victim, reviewed the x-rays again in more detail, reviewed all other medical records, and then spoke with the other clinicians involved before generating a detailed consultation note. Dr. Lowen identified x-rays taken of the victim. On the x-rays, she identified a fracture in the victim's left first rib, multiple oblique rib fractures, a fracture of his left thigh bone (femur), a fracture of his right thigh bone, a fracture to the victim's right forearm, a fracture to the right tibia, and fractures to the lower ribs.

Dr. Lowen testified that when she first spoke with the Defendant, only the rib fractures had been discovered. The Defendant told Dr. Lowen that he and N.S. were "very surprised" by the fractures and that the victim had never fallen, been dropped or sustained any injuries. Dr. Lowen then spoke with N.S., who also seemed "very, very surprised" by the finding of rib fractures. N.S. confirmed that the victim had never fallen, been dropped, or experienced any traumas. N.S. disclosed that she noticed a "big change" in the victim about a week after release from the NICU. She stated that "'everything went downhill,'" and the victim began to "'scream all the time.'" N.S. indicated that she and the Defendant were "pretty much the only caretakers." N.S. told Dr. Lowen that the Defendant took care of the victim while she worked seventy-five to one hundred hours over a two-week period. The Defendant confirmed to Dr. Lowen that he took care of the victim while N.S. worked. N.S. told Dr. Lowen that both she and the Defendant would "get frustrated" with the victim when he was screaming and crying.

13

Dr. Lowen testified that N.S. and the Defendant reported bruising on the back of the victim's legs that N.S. indicated was caused by him sitting in his car seat too long. Dr. Lowen did not find this explanation consistent with a cause for bruising. After speaking with the Defendant and N.S., she examined the victim, noting numerous bruises on the victim, including a purple bruise on his ear. Dr. Lowen testified that she photographed the bruising because bruising on little babies who are not independently mobile was "very concerning." She explained that bruising on an infant indicates external force as a cause because an infant lacks the strength to cause the bruising. In reference to the bruise on the victim's ear, Dr. Lowen stated that the ear was "a common location for abusive bruises." She also noted that the bruising on the victim's extremities were in close proximity to the fractures.

Dr. Lowen testified about the fractures on the x-rays, noting that it takes approximately seven days, and sometimes up to ten days, before healing will show on an x-ray. The fracture on the victim's left first rib showed no signs of healing so it likely had occurred in the seven days prior. Likewise, the fracture to the ninth rib also showed no signs of healing. The first abdominal x-ray taken on October 4, to look for possible causes of vomiting, showed healing rib fractures on both sides of the victim's rib cage, indicating that the fractures occurred more than seven to ten days earlier. As to the two femur fractures, Dr. Lowen testified that there were "early signs of healing," indicating they were older than about seven days, but not "very old." Looking at the x-ray for the right forearm, Dr. Lowen noted that there were three fractures that were "new."

Dr. Lowen testified that, after photographing the bruising and reviewing the additional x-rays taken, she spoke with N.S. again and notified her of the multiple fractures in three extremities and multiple rib fractures at various stages of healing. She further informed N.S. that due to these injuries she was required by law to notify investigating authorities. Dr. Lowen recalled that N.S. was "upset and tearful" at learning this news.

Dr. Lowen testified that the radiologist who did the initial reading of the skeletal survey indicated the possibility of mild osteopenia, meaning that the bones did not look as mineralized as normal. Dr. Lowen spoke with this radiologist and several other radiologists who reviewed the images and concluded that the victim did not have mild osteopenia. The radiologists believed it was a function of the technique used to take the x-rays and not a problem with the actual bones. Due to the nature of the case, Dr. Lowen ordered additional labs to look for any risk factors for major bone problems and requested involvement from the genetics team. The lab results indicated no risk factors for bone problems and the geneticist, based upon his clinical evaluation, thought testing was unnecessary for Osteogenesis Imperfecta, brittle bone disease. Nonetheless, Dr. Lowen

asked that the victim's blood work be sent to a lab in Washington that would test for brittle bone disease. The lab in Washington confirmed that the victim did not have Osteogensis Imperfecta. Dr. Lowen noted that the victim did not sustain any additional fractures following his removal from N.S. and the Defendant's custody. Over the course of the month, the subsequent x-rays showed healing, which she said would not be the case for a baby with severe bone problems. Dr. Lowen testified that the bruising also supported the conclusion that the victim had undergone some sort of trauma.

The State asked Dr. Lowen "what mechanism would it take to cause all of these injuries?" Dr. Lowen responded, "[the victim], with 23 fractures[2] of varying ages on varying parts of his body and bruises on three extremities and an ear, that whole constellation, that whole series of injuries indicates that he was a victim of child abuse, and that's my medical diagnosis." Dr. Lowen was then asked to read the statements the Defendant provided about his interactions with the victim. She stated that, in her medical opinion, these instances documented by the Defendant might explain some of the injuries but not all.

Jennifer England testified that she served as the victim's foster mother for a year. On October 10, 2012, she picked up the victim from Vanderbilt Children's Hospital. She described the victim as pale, very small, and still wearing a cast on his arm. Ms. England explained that, at that time, there were six children living in her household. She was the primary caregiver for the victim but her husband and children also helped care for the victim. She said that her children loved to play with him. In October 2013, the victim was placed with his biological father. She said that she still had visitation with the victim every other weekend because the victim had built a relationship with her children and they enjoyed playing together.

Ms. England testified that, on October 20, 2012, ten days after the victim came to live with her, his cast slid off his arm. She "panicked a little bit," wrapped it up, and took him to the Vanderbilt Hospital Emergency Department. His arm was x-rayed and re-casted but no new injuries were found. The victim returned to Vanderbilt Hospital on October 25, 2012, and his bones had healed sufficiently for removal of his cast. Ms. England stated that the victim had sustained no new fractures since the discovery of the fractures on October 4, 2012.

---

[2] We note that Dr. Lowen's testimony of twenty-three fractures is inconsistent with Detective Massey's testimony of eighteen; however, her medical report and x-rays included in the record support her testimony that there were twenty-three fractures. Based upon her testimony it appears that she estimated the number of breaks at a prior hearing but literally counted the fractures the night before she testified in preparation for trial.

Randy Dickens, the victim's biological father, testified that he had had custody of the victim for about a year and a half. He confirmed that the victim visited Ms. England every other weekend. Mr. Dickens confirmed that the victim had not had any broken bones while under his care.

The defense presented the following evidence: Ronald Wright, a forensic pathologist, testified that he reviewed the victim's medical records. Dr. Wright stated that he did not see any evidence of Shaken Baby Syndrome when reviewing the victim's x-rays. He stated that the victim had many fractures but some of the fractures identified at Vanderbilt Hospital he did not "believe existed." He explained that he had conducted three autopsies on children who were diagnosed with "classic metaphyseal bucket handle fractures," but found during the autopsies that the fractures did not exist. He believed that the abnormality of formation in the bones of young children could be attributed to Vitamin D deficiency rather than a "classic metaphyseal bucket handle fracture[]."

Dr. Wright testified that, although he thought some of the fractures were not "real," the rib fractures were "real" and at varying stages of healing. Dr. Wright opined that the victim's rib fractures may have been a result of Ricketts disease. He explained that the victim's total Vitamin D level was "normal," however the victim's D2 was abnormal. He noted that the victim received Vitamin D in the hospital making it difficult for him to assess whether or not there was a deficiency. Dr. Wright stated that the x-rays of the fractures were visibly consistent with photographs of children suffering from Ricketts disease. Dr. Wright stated, "I think [the victim]'s a Ricketts case although he could well have been abused too. They overlap each other."

Dr. Wright testified that in reviewing the x-rays he believed that the victim had osteopenia. Clarifying that he was not a radiologist, he went on to state that "they seem not to be white enough" as reasoning for his belief that the victim had osteopenia. He stated that it would be important for a caregiver to know a diagnosis of osteopenia and that he did not see any indication in the medical records that N.S. or the Defendant were informed of the possible diagnosis of osteopenia.

After the defense finished direct examination of Dr. Wright, the State asked for a jury-out hearing where it addressed concern that Dr. Wright was never qualified as an expert. The defense acknowledged the error in failing to do so, and the State agreed to allow the defense to reopen proof to have Dr. Wright qualified as an expert. After further questioning of Dr. Wright about his educational background and experience, the trial court, without objection by the State, qualified Dr. Wright as an expert in the field of forensic pathology.

On cross-examination, Dr. Wright testified that the last time he performed an autopsy on an infant was in the early 1970s. Dr. Wright agreed that, based on the number of breaks in this case, it "was highly suspicious for abuse." Dr. Wright stated that he would not be surprised if the treating physician had testified that the victim's blood was drawn and then the victim was administered Vitamin D because that procedure was "standard." Dr. Wright confirmed that the victim had fractures in varying stages of healing.

Stephen Montgomery, a Vanderbilt University assistant professor of psychiatry, testified as an expert in the field of forensic psychiatry. Dr. Montgomery had reviewed the Defendant's recorded statement to police and expressed concern about the length of the "whole process." Dr. Montgomery explained that research had shown that lengthy interrogations "can be one of the factors that might contribute to someone making a false statement or a false confession." The studies indicate that youth, "a type of psychological vulnerability," and the type of interview techniques employed can also contribute to a person making a false statement to police. Dr. Montgomery stated that he observed some of these techniques employed during the Defendant's interview.

Dr. Montgomery testified that he also interviewed the Defendant and conducted a psychiatric evaluation of him. He noted that the Defendant was twenty-two years old at the time of the police interviews and had a family history of mental illness. The Defendant also disclosed marijuana use for several years as a teenager. Dr. Montgomery stated, "It has been shown that when people use [marijuana] heavily on a daily basis, particularly during the teenage years, that it is toxic to brain development and has increased the rate of serious mental conditions."

Dr. Montgomery described the Defendant as "meek" and not "the most outgoing, confident-type person." The Defendant had disclosed to Dr. Montgomery that he was using prescription pain medication at the time of the police interview due to several medical conditions. Based upon this disclosure, Dr. Montgomery believed the Defendant to be experiencing "some degree of pain" and "also on pain medication" at the time he gave the October 19, 2012 statement. Dr. Montgomery agreed that pain and prescribed medication could affect the reliability of a statement but noted that the Defendant did not appear intoxicated in the recording of the October 19, 2012 statement.

Dr. Montgomery testified that he administered the Gudjonsson Test of Suggestibility with the Defendant. He explained that this test was designed to assess a person's vulnerability to "these type" of leading interviews by using questions suggesting certain types of responses. Overall, considering the police interview, his interview with the Defendant, and the test results, Dr. Montgomery stated that there was indication that

the Defendant "does have some of the traits that would make him more psychologically vulnerable."

On cross-examination, Dr. Montgomery testified that in his twenty years of conducting evaluations, he had only administered the Gudjonsson Suggestibility Scales five to ten times. He explained that the test had not been widely available until more recently. Dr. Montgomery agreed that the Defendant knew he was meeting with Dr. Montgomery about an evaluation of his "state of mind" during the police interview and not for treatment. Dr. Montgomery confirmed that the Defendant understood that the results of the evaluation would be made available to the jury.

Samantha Crawford, the Defendant's sister, testified that she had two children who the Defendant "watches . . . sometimes" and she "never had any problems." She said that she had never seen the Defendant hit or yell at her children. She described the Defendant as "laid back" and "calm." She had never seen him fight with anyone and did not think he had ever been in a physical fight with another person.

On cross-examination, Ms. Crawford testified that the Defendant had cared for her children over night before but no longer. Ms. Crawford said that she was unaware that the Defendant had admitted being aggravated with the victim and was rough with the victim. She stated that she was also unaware that the Defendant had told N.S. around the time of these injuries that the two-month-old victim was a "pussy" and "needed to man up and stop crying."

Tina Jones, the Defendant's mother, testified that the Defendant, N.S., and the victim were at her home every weekend from the time the victim was released from the hospital following his birth. She described the victim as "a happy little baby, always smiling." Ms. Jones stated that the Defendant had a good temperament and was not a violent person. Ms. Jones was also unaware of the Defendant's statement to N.S. about the victim and his statement about being aggravated and rough with the victim at times.

N.S. testified that she and the Defendant had been in a relationship since 2012. She said that they had a one-year-old child together and another baby "on the way." N.S. stated that their relationship began when she was pregnant with the victim. She denied that the Defendant had ever been violent toward her and described him as the "[c]almest person [she had] ever met in [her] life."

N.S. testified that the victim was born a month early and remained in the hospital for a month after his July 31, 2012, birth. N.S. recalled that, after coming home from the hospital, there were "people constantly around every weekend." She said that she and the Defendant stayed at the Defendant's mother's house every weekend and that the

18

Defendant's sister would babysit during the week. She stated that the victim "was always around people." N.S. stated that she returned to work six days after giving birth to the victim and, once the victim was released from the hospital, the Defendant cared for the victim while N.S. worked.

N.S. described the victim as "a happy baby" other than some difficulty with acid reflux. She recalled that he would "throw up a lot" after feeding. She said that this seemed to irritate the victim, and he began to cry after feedings. N.S. said that throughout the day she would return to the room where they lived and feed the victim and change his diapers. She estimated that she was with the victim more than she worked.

N.S. testified that she called the pediatrician when the victim vomited blood. The pediatrician instructed her to go to Vanderbilt Hospital. She and the Defendant took the victim to the hospital and, after fifteen to twenty minutes, they were told that the victim had acid reflux and "it was normal." She was told that if the victim "threw up a blood clot bigger than the size of a golf ball then to bring [the victim] back." N.S. said that they were about to discharge the victim when she and the Defendant spoke privately. The two decided that, due to the victim's "crying and stuff like that," they wanted further testing related to the victim's acid reflux. The hospital staff complied by taking more x-rays of the victim. It was after the additional x-rays that Dr. Lowen informed her that the victim had multiple fractures.

N.S. looked at the photographs Dr. Lowen took of the victim at the hospital, and she testified that the bruising in the photographs were caused by the medical staff's handling of the victim. She stated that there was not a mark on the victim's body when she brought him to the hospital. N.S. testified that she never considered that the Defendant caused the victim's injuries. She said that the Defendant was "a fabulous daddy." She stated that she had no concern about leaving their one-year old child with the Defendant. She said that the Defendant watched their child alone "all the time."

On cross-examination, N.S. testified that she worked between forty and eighty hours a week at the time of this incident and that the Defendant was the primary caregiver for the victim while she worked. N.S. agreed that she was upset when Vanderbilt Hospital staff suggested that she had abused the victim. She denied that she had ever harmed the victim. She also denied ever telling Detective Massey that she and the Defendant were the only people who took care of the victim. She said that she told "everyone" that many people were around the victim.

N.S. agreed that she had testified that there were no marks on the victim when she brought him to the hospital. She conceded that there was "one small little mark on the back of his thigh" that she attributed to his car seat; however, Dr. Lowen told her that was

not possible. N.S. denied ever telling her manager at Value Place that the Defendant had called the victim a name because he cried and stated that the victim needed to "man up."

The Defendant testified that he was twenty-four years old and worked for Metro Flooring laying hardwood floors. The Defendant recalled that the first week that the victim was home after release from the hospital "everything was good." He described the victim as eating normally and sleeping most of the day. At some point, however, the victim began "not holding his feed down" and not wanting to eat. With these changes the victim became "more cranky." The Defendant said that the pediatrician diagnosed the victim with acid reflux so he began following the physician's treatment for acid reflux. The treatment helped for a while, but when it stopped helping, they returned to the pediatrician, who referred the victim to Vanderbilt Hospital.

The Defendant testified that, at Vanderbilt Hospital, medical personnel confirmed the diagnosis of acid reflux. As the hospital personnel were preparing the victim for discharge, the Defendant and N.S. discussed their concern about the victim's refusal to eat and fussiness. Based upon these concerns, they requested additional testing. The Defendant said that he felt "[s]hock and disbelief" when he learned about the victim's fractures. He recalled that he first spoke with Dr. Lowen and then spoke with Detective Massey about the victim's injuries. He said he spoke with Detective Massey for about thirty to forty-five minutes and signed the written statement summarizing his statements to Detective Massey.

The Defendant testified that the news of the victim's injuries was devastating and that he and N.S. researched for days trying to figure out what could have caused the injuries. The victim was removed from N.S.'s custody and an order of protection was filed against the Defendant. The Defendant agreed to meet with Detective Massey on October 19, 2012. When he arrived at the police station, he was informed that the officers were not ready for him yet, so he and N.S. waited. He estimated that he was at the police station for five to six hours. He said that the video recording of the interview shown to the jury was a very small portion of what occurred that day at the police station. He stated that the recording did not show, "several people in your face telling you that you are being dishonest and that they know you done this and you're being dishonest and you're being dishonest and you're just not telling us the truth."

The Defendant testified that he did not contact an attorney before going to the police station because he did not believe he "even remotely" needed an attorney. The Defendant said that, while at the police station, he was moved between two different rooms. One of the rooms was very cold, and he put his arms inside his shirt to try to stay warm. He recalled that he was also passing a kidney stone at the same time and the cold

20

air caused him further discomfort. He explained that he did not leave the cold room because he did not believe that he could leave.

The Defendant testified that he was taking medication at the time and told law enforcement at the police station before he gave his statement. The Defendant confirmed that what he said in the October 19, 2012 statement was true, but he was not "completely clear headed" due to the effect of his medications and stress.

The Defendant read the following statement aloud:

> I, Anthony, was asleep after [N.S.] went to work and the baby started crying so I was aggravated and picked him up and carried him with one arm squeezing him and then layed down, patted his butt and then went back to sleep.
>
> I, Anthony, was taking a bath and had just got shampoo in my hair and heard the baby scream. I rinsed the shampoo out of my hair in a hurry and ran to see what was wrong. He had spit up and was choking on it so I picked him up with one hand and squeezed him while I put underwear on to try to help get some of the spit up out then laid him down while aggravated a little rough and continued to clean the spit up off of him then changed his diaper and wrapped him up.

The Defendant confirmed that he wrote that statement and signed it. The Defendant estimated that he was questioned and interrogated "at least two hours" before he wrote the statement. About his use of the word "aggravated" in his statement, the Defendant explained that he was not angry or mad, just irritated. He testified that he felt like he had to give a statement.

The trial court then interrupted the direct examination and excused the jury. He then addressed defense counsel as follows:

> [T]he question of voluntariness is not before this jury, only reliability. I'm going to instruct the jury that every statement that he's given is properly before them. There is no question about the voluntariness of it. There's no finding that he was coerced or otherwise threatened, so that question is way out of bounds, way out of bounds, sir; do you understand?

After the jury returned, the trial court instructed the jury that the determination of whether the Defendant's statements were voluntary had already been made, and the statements were produced as a result of the Defendant's "own free will and choice." The

21

trial court told the jury to examine the statements to determine their "reliability, truthfulness, and the like . . . but as a matter of law, these statements are properly before you and are voluntary." Defense counsel objected to the instruction.

The Defendant testified that he did not think he told Dr. Lowen that he and N.S. were the only people who had access to the victim because that was not the truth. The Defendant said that his friends who lived in the same building, N.S.'s manager, N.S.'s co-workers, and his family interacted with the victim. The Defendant explained these interactions as "one of those 'your baby is cute' and so they're asking if they can hold him and stuff." The Defendant stated that, at his mother's house, his family members were always holding the victim because they loved babies.

The Defendant next read the second statement he gave at the police station on October 19, 2012.

> I, Anthony, was asleep after [N.S.] went to work. The baby started crying while I was asleep so I got aggravated and got up and grabbed him and squeezed him. I heard a little pop and I said to myself what was that? It didn't seem to bother the baby so I didn't think nothing of it, so we laid down, I patted his butt to get him back to sleep, and we fell asleep. I didn't' call anyone because I was afraid of what might happen and I thought it was just a bone popping.

The Defendant denied doing anything to hurt the victim, stating that he loved the victim. He stated that he had never been accused of harming any child. He said that his "children are his life." He explained that, before meeting N.S., he had a daughter with another woman. He was the primary caretaker for his daughter for a time and never harmed his daughter or was accused of harming her. He also currently cared for his one-year-old son that he had with N.S.

On cross-examination, the Defendant testified that he saw his daughter approximately ten times a year. He said that he had not seen her more because she lived in Shelbyville, Tennessee. He also thought that his daughter's mother did not like him because of "money issues and not being there when I always should have been." The Defendant agreed that he had testified that his statements were true even though he may have been in pain at the time.

The Defendant testified that when asked by a detective if he had told N.S. "everything," he responded "I'm holding back on her too." The Defendant also agreed that he told law enforcement, "I got tired of hearing him cry and I was angry and I was aggravated" and "It had to have been his ribs." The Defendant recalled telling a detective

22

that the "pop" he heard was "[o]bviously . . . something breaking." The Defendant denied, however, telling law enforcement that he did not want the entire interview recorded. Although certain that the law enforcement officers lied about his decision not to record a portion of the interview, the Defendant maintained that he did not remember "a lot about that day."

The Defendant agreed that "maybe at the time" he told "other people" that only he and N.S. had access to the victim. He explained that he was under stress when he was speaking with Dr. Lowen just after learning of the victim's numerous fractures. He said that his statement to Detective Massey that he and N.S. were the primary caregivers was also untrue and that he said it because he was "stressed" at the time. The Defendant clarified that, during the week, he and N.S. were the exclusive caretakers of the victim but that on the weekends, his entire family took care of the victim.

The Defendant agreed that he told law enforcement about the incident when he was handling the victim and heard the "pop," and that he had stated that he did not tell anyone because he was "afraid they might think I abused the child."

The State made its elections as to the offenses. Count 1 was to apply to the victim's "new fractures" and Count 2 was to apply to the victim's "healing fractures." The State then called Rebecca Walpole as a rebuttal witness. Ms. Walpole testified that she was the general manager at Value Place in Lebanon, Tennessee. Ms. Walpole stated that she worked with N.S. as a housekeeper but had since been promoted. She confirmed that N.S. and the Defendant lived for a period of time at Value Place. In 2012, Ms. Walpole saw N.S. on an almost daily basis. She said that N.S. worked between thirty-five and forty hours a week. One day, shortly before the victim's fractures were discovered, N.S. returned to work after checking on the victim and was upset. When Ms. Walpole asked N.S. what was wrong, N.S. said that, "[the Defendant] had told her that the [victim] had been crying quite a bit and he couldn't get [the victim] calmed down and [N.S.] said that [the Defendant] told her that the baby was a pussy and needed to man up and quit crying."

The State recalled Detective Massey as a rebuttal witness. Detective Massey testified that he spoke with N.S. multiple times and on several different occasions N.S. was asked if anyone else had access to the victim. She consistently responded that she and the Defendant were the only people with access to the victim. The Defendant also told him on more than one occasion that he and N.S. were the victim's only caretakers.

After hearing the evidence, the jury convicted the Defendant of the lesser-included offense of aggravated assault in Count 1 and the lesser-included offense of child abuse in Count 2. The trial court sentenced the Defendant to serve six years for the aggravated

assault conviction and four years for the child abuse conviction. The sentences were to be served consecutively for a total sentence of ten years in the Tennessee Department of Correction.

## II. Analysis

On appeal, the Defendant asserts that: (1) the trial court erred when it denied his motion to dismiss the indictment upon double jeopardy grounds; (2) the trial court improperly commented on the evidence; (3) the trial court erred when it precluded the Defendant's expert witness from testifying at the suppression hearing; (4) the trial court erred when it denied the Defendant's motion to suppress his October 19, 2012 statement; (5) the evidence is insufficient to support the convictions; (6) the trial court erred when it allowed the State to cross-examine witnesses about "highly prejudicial statements" made by the Petitioner about the victim; (7) the State did not properly make an election of offenses depriving the Defendant of a unanimous verdict; (8) the cumulative effect of the errors deprived the Defendant of a fair trial; and (9) the trial court improperly ordered consecutive sentencing.

## A. Double Jeopardy

The Defendant claims that double jeopardy barred a retrial; therefore, the trial court erred in denying his motion to dismiss the indictment. The State responds that the Defendant's failure to object, when given the opportunity, should be viewed as consent to the trial court's decision to declare a mistrial.

The granting of a mistrial is within the sound discretion of the trial court, which will not be disturbed on appeal absent a finding of abuse of discretion. *Freeman*, 669 S.W.2d at 692; *State v. Compton*, 642 S.W.2d 745, 746 (Tenn. Crim. App. 1982). In making this determination, "no abstract formula should be mechanically applied and all circumstances should be taken into account." *Jones v. State*, 403 S.W.2d 750, 754 (1966).

The double jeopardy clauses of the state and federal constitutions protect against (1) a second prosecution for the same offense after conviction, (2) a second prosecution for the same offense after an acquittal and, (3) multiple punishments for the same offense. *State v. Maupin*, 859 S.W.2d 313, 316 (Tenn. 1993); *State v. Griffith*, 787 S.W.2d 340, 341 (Tenn. 1990). There are exceptions, however, to the prohibition against double jeopardy. For instance, retrial may be permitted if the defendant consented to the termination of the proceeding at issue. *United States v. Scott*, 437 U.S. 82, (1978); *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. 1981); *Seiber v. State*, 542 S.W.2d 381, 385 (Tenn. Crim. App. 1976). "In such a case the accused has deliberately elected to forego

his right to have guilt or innocence determined by the first trier of fact." *Knight*, 616 S.W.2d at 596.

Additionally, a retrial is permitted where there is a "manifest necessity" for the declaration of the mistrial, regardless of a defendant's consent or objection. *United States v. Dinitz*, 424 U.S. 600, 606 (1976); *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1978). "If it appears that some matter has occurred which would prevent an impartial verdict from being reached, a mistrial may be declared and a claim of double jeopardy would not prevail on a subsequent trial." *Arnold*, 563 S.W.2d at 794 (citing *Illinois v. Somerville*, 410 U.S. 458 (1973)). When a mistrial is declared because of a manifest necessity, double jeopardy is not violated when the defendant is retried, even if he objected to the mistrial. *Dinitz*, 424 U.S. at 606; *State v. Freeman*, 669 S.W.2d 688, 692 (Tenn. Crim. App. 1983); *Donaldson v. Rose*, 525 S.W.2d 853, 855 (Tenn. Crim. App. 1975).

A contemporaneous objection on the record to the trial court's declaration of a mistrial may be crucial because a retrial is not barred by double jeopardy where a defendant consents to the termination of the trial, notwithstanding the lack of a manifest necessity for doing so. *State v. Mounce*, 859 S.W.2d 319, 322 (Tenn. 1993) (citing *Knight*, 616 S.W.2d at 596). Indeed, "a defendant who stands silent at a time when he could have objected to the action taken by the trial court may often be considered to have acquiesced in that particular course of action," *State v. Skelton*, 77 S.W.3d at 799 (citing *Mounce*, 859 S.W.2d at 322-23), and, "when a defendant chooses not to object to the mistrial and give the trial court an opportunity to correct the error, consent may be inferred and, therefore, double jeopardy will not bar a subsequent prosecution," *Mounce*, 859 S.W.2d at 323. Before consent will be inferred from the defendant's silence, however, the "defendant must have a realistic opportunity to object, prior to a trial court's sua sponte declaration of a mistrial." *Skelton*, 77 S.W.3d at 800 (citing *Mounce*, 859 S.W.2d at 323).

At the Defendant's first trial, Dr. Montgomery testified about research on factors that can influence a person to make a false incriminating statement. Some of the factors identified involved police interrogation techniques. After Dr. Montgomery's summary of this research, defense counsel asked Dr. Montgomery, "Did you find any evidence of those type of techniques in this case?" Dr. Montgomery responded in the affirmative and identified a number of influences possibly affecting the Defendant at the time of his statement. During this explanation, Dr. Montgomery stated the following:

So it appears that he was likely in some degree of pain. He had not been sleeping well. He was also under the affects [sic] of some narcotic pain medication. So we have those individual factors along with what he

25

told me that the whole process - - the whole process of the polygraph and the interrogation that followed lasted over five hours.

The trial court excused the jury and the following exchange occurred:

THE COURT:        All right.  What do you have to say, General?

[STATE]:          Judge, you know what I'm going to say.  I thought this was off limits.  Detective Massey spent three hours the night before our first day making sure that every mention of the word polygraph or any other phrase that could lead the jury to get to that conclusion that a polygraph had been given was redacted, that clearly it was off limits, so I'm disappointed to hear it mentioned.

THE COURT:        Well, I'm asking what do you want me to do?

[STATE]:          Well, I don't know.  We're two days into this.  I do not want to - - two very painful days into this, frankly.  I'd hate to start over.

THE COURT:        Well, what do you want me to do?

[STATE]:          I don't know.  I don't know.  I'm not going to ask for a mistrial.

THE COURT:        What do you want me to do, Mr. Love.

MR. LOVE:         Just not to have that in.

THE COURT:        Well, it's in.

MR. LOVE:         Well - -

THE COURT:        I heard it.  Your own motion in limine addressed this and now your witness mentioned it.  Tell me, how can I - - what can I do about this?

MR. LOVE:         Well, I can ask him not to mention that.

26

THE COURT:    Well, yeah, I can - -

MR. LOVE:    I mean, mention it any further, I mean.

THE COURT:    I just - - if the shoe had been on the other foot, if Detective Massey had said something about it - - they went to great lengths, or the State did, to cover up the existence of the issue - - nobody from the State mentioned it. In the audio tape I watched, we had a log of when the thing was to be turned off, and if an error had been made, what would you have asked me to do, Mr. Love?

MR. LOVE:    Well, I can't say for sure.

THE COURT:    You would probably ask for a mistrial, wouldn't you, right?

MR. LOVE:    Not necessarily, but more than likely.

THE COURT:    Well, I would think that you probably would because that's why you filed your motion in limine. I find it is in the manifest interest of justice in this case to declare a mistrial. I'm sorry. That's what I'm going to do.

In the present case, despite the discussion regarding possible alternatives to a mistrial, the Defendant lodged no objection to the trial court's declaring a mistrial or the jury's release. Thus, the Defendant had a reasonable opportunity to object and did not do so. Because we conclude that the Defendant consented to the mistrial, double jeopardy does not bar a retrial regardless of the presence or absence of manifest necessity. The Defendant is not entitled to relief.

### B. Trial Court's Instruction to the Jury on the Voluntariness of the Defendant's Statements to Police

The Defendant asserts that the trial court improperly commented on the voluntariness of the Defendant's statement to the police, thereby depriving the Defendant of a fair trial and his constitutional right to present a defense. The State responds that the trial court properly instructed the jury regarding the voluntariness of the Defendant's statements to police.

27

In Tennessee, judges are constitutionally prohibited from commenting upon the credibility of witnesses or the evidence in a case. *See* Tenn. Const. art. VI, § 9 (providing that "judges shall not charge juries with respect to matters of fact, but may state the testimony and declare the law"). "In all cases the trial judge must be very careful not to give the jury any impression as to his feelings or to make any statement which might reflect upon the weight or credibility of evidence or which might sway the jury." *State v. Suttles*, 767 S.W.2d 403, 407 (Tenn. 1989). Our Supreme Court has held, however, that "not every comment on the evidence made by a judge is grounds for a new trial." *Mercer v. Vanderbilt Univ., Inc.*, 134 S.W.3d 121, 134 (Tenn. 2004). The trial court's comments must be considered in the overall context of the case to determine whether they were prejudicial. *Id*. (citing *State v. Caughron*, 855 S.W.2d 526, 536-37 (Tenn. 1993)).

During direct examination of the Defendant about his statement to the police, defense counsel asked, "Did you feel like you had to give some kind of statement?" The Defendant responded, "I felt like I did, yeah." The trial court then excused the jury and addressed defense counsel:

THE COURT:　　Mr. Love, the question of voluntariness is not before this jury, only reliability. I'm going to instruct the jury that every statement that he's given is properly before them. There is no question about the voluntariness of it. There's no finding that he was coerced or otherwise threatened, so that question is way out of bounds, way out of bounds, sir; do you understand?

MR. LOVE:　　Yes, sir.

The jury returned to the courtroom and the trial court instructed the jury as follows:

THE COURT:　　Ladies and gentlemen, the last question Mr. Love asked was did you feel like you had to give a statement. Let me give you an instruction about this. This Court has determined as a matter of law that the statement, multiple statements, the video, the two handwritten statements, the - - let's just say the statement given to Agent Massey and all statements were voluntarily given, that is, of his own free will and choice. Had this Court made a decision opposite that, you would not have heard any of those statements.

28

Now, it will be up to you to look at each of these statements to determine their reliability, truthfulness, and the like, along those lines, but as a matter of law, these statements are properly before you and are voluntary.

Defense counsel objected to the jury instruction, the objection was overruled, and direct examination resumed.

Prior to deliberation, the trial court instructed the jurors on how to consider the Defendant's statements:

Evidence has been introduced in this trial of a statement or statements by the defendant made outside the trial, to show an admission against interest. An admission against interest is a statement by the defendant which acknowledges the existence or truth of some fact necessary to be proven to establish the guilt of the defendant or which tends to show guilt of the defendant or is evidence of some material fact, but not amounting to a confession.

While this evidence has been received it remains your duty to decide if in fact such statement was ever made. If you believe a statement was not made by the defendant you should not consider it. If you decide the statement was made by the defendant, you must judge the truth of the facts stated. In so determining, consider the circumstances under which the statement was made. Also consider whether any of the other evidence before you tends to contradict the statement in whole or in part. You must not, however, arbitrarily disregard any part of any statement, but rather should consider all of any statement you believe was made and is true. You are the sole judge of what weight should be given such statement. If you decide a statement was made, you should consider it with all other evidence in the case in determining the defendant's guilt or innocence.

The trial court also instructed the jury as to how it should consider its rulings on the admissibility of evidence:

At times during the trial, I have ruled upon the admissibility of evidence. You must not concern yourself with these rulings. Neither by such rulings, these instructions nor any other remarks which I have made

do I mean to indicate any opinion as to the facts or as to what your verdict should be.

In his brief, the Defendant acknowledges that the trial court's "instruction as to the reliability/voluntariness issue were basically correct statements of the law" but asserts that the trial court "went beyond a simple instruction" and into improper comment. We cannot fault an instruction on an applicable, correct principle of law unless, in context, it is confusing or misleading. In context, we do not believe that the instruction risked confusing or misleading the jury. The instruction was given immediately after the testimony at issue. The trial court also, prior to juror deliberation, instructed the jury, consistent with the Tennessee Pattern Jury Instructions, on how to consider the Defendant's statement and how to consider the trial court's rulings on the admissibility of evidence. We are not persuaded that the trial court's instruction concerning the voluntariness of the Defendant's statements constituted an improper comment on the evidence. *See State v. Suttles,* 767 S.W.2d 403, 406-07 (Tenn. 1989).

Concerning the Defendant's assertion that the trial court deprived the Defendant of his constitutional right to present a defense, we note that in *Crane v. Kentucky*, 476 U.S. 683 (1986), the Supreme Court addressed this issue stating, "the requirement that the court make a pretrial *voluntariness* determination does not undercut the defendant's traditional prerogative to challenge the confession's *reliability* during the course of the trial." In the case before us, the trial court had previously ruled, before the Defendant testified at trial, that the Defendant's statements met the legal standard of "voluntariness" for the purpose of determining that the statements were *admissible* into evidence. *See State v. Echols*, 382 S.W.3d 266, 280 (Tenn. 2012), *citing Pursley*, 550 S.W. 2d 949 (Tenn. 1977). It appears that the trial court in this case interpreted the Defendant's testimony at trial that he felt like he had to give some kind of statement as a repudiation of the trial court's prior ruling that the statement was "voluntary" for purposes of admissibility. Following the trial court's determination that the statements were *admissible*, however, the Defendant was entitled to testify about the circumstances surrounding the statement to assist the jury in determining whether the Defendant made the statement and whether it was truthful. *See State v. Burns*, 29 S.W.3d 40, 48 (Tenn. Crim. App. 1999).

As such, we believe the trial court erred in cutting off the Defendant's testimony when the Defendant stated that he felt like he had to give a statement. The manner in which the confession was obtained is relevant to the reliability and credibility of the statement and is proper for the jury to consider. In light of other testimony from the Defendant and his expert witness, Dr. Montgomery, about the circumstances surrounding the making of the statement, we conclude that the error is harmless. The Defendant is not entitled to relief as to this issue.

## C. Exclusion of Expert Witness at Suppression Hearing

The Defendant argues that the trial court erred in not considering his expert witness's testimony at the suppression hearing. The State responds that the trial court correctly determined that the Defendant's susceptibility to coercion was not relevant to the issue of voluntariness at the hearing on the motion to suppress, absent any evidence of coercion by police. We agree with the State.

The rules that govern the admissibility of such evidence are Tennessee Rules of Evidence 702 and 703. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Rule 703 addresses the reliability of expert opinion testimony. In addition to complying with Rules 702 and 703, the evidence must be relevant under Rule 401. *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 264 n.8 (Tenn. 1997). Therefore, the trial court must "determine that the expert testimony is reliable in that the evidence will substantially assist the trier of fact to determine a fact in issue and that the underlying facts and data appear to be trustworthy." *Brown v. Crown Equipment Corp.*, 181 S.W.3d 268, 274 (Tenn. 2005).

Generally, the admissibility of expert testimony is a matter entrusted to the sound discretion of the trial court, and there can be no reversal on appeal absent clear abuse of that discretion. *State v. Copeland*, 226 S.W.3d 287, 301 (Tenn. 2007); *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993).

Before hearing the evidence at the suppression hearing, the trial court addressed the issue of whether the Defendant's expert would be allowed to testify:

TRIAL COURT: Let's put on your proof about the interview, all right? Because there still has to be a threshold requirement that there was coercion. I have to make that finding before I even - - there has to be a showing there objectively, I think, that there's some coerciveness here, because if you don't have that, then all the experts in the world won't help. That's the threshold. That's

what the case law tells me. Would you agree with that, Mr. Love?

MR. LOVE: I would agree that - - yes.

TRIAL COURT: If there's no coercion, then it doesn't matter how susceptible, no nothing. You've got to have that as a threshold. You've got to cross that threshold.

The trial court then heard Detective Massey testify, viewed the video recording of the Defendant during his statement made at the police station, and heard the Defendant and Mr. Smith's testimony. At this point, the Defendant called his expert witness, Dr. Montgomery, and the State objected. The trial court then stated:

I'm going to sustain. . . . The reason I'm sustaining, I have heard no proof with regard to coercion. . . . [So] consequently, I find that there is no coercion in this case and that the doctor in question . . . would not substantially assist the trier of fact.

. . . .

First of all, I have to look at the characteristics of the defendant. His age, he said was 20 or 21 years old. His intelligence, this Court saw him and heard him testify here in open Court but saw him on the video. As I said earlier, he described that concept that even Mr. Smith mentioned to him, situational offense where he kind of loses control. He described that himself.

He even talked about Googling something and kind of generally understanding what a polygraph was about. He does just have a 9th grade education, according to his own testimony.

Criminal experience, this court has heard that maybe he had a misdemeanor possession charge and there might have been something to the effect about a juvenile charge, so not much experience there.

His mental and physical condition at the time of the interrogation, he told this court that he had taken less of the prescription drug, hydrocodone, rather than more of it. I find after looking at the video that he seemed to be coherent, was responsive to questions, listened, as I said, and I could repeat

32

myself several times about that situational offense, he outlined that. He asked questions.

I don't doubt that he was nervous, because most people that are subject to investigation can be nervous, but he said that he was scared to death. Well, he outlined why; he didn't want to lose his girlfriend or his family or the child and he wanted to show he was a man. So he talked about things very intelligently.

I also observed him testify here. He seemed to understand all the questions. He did say that they called him a liar a thousand times. He also explained that he was there and was without sleep for four and then it went up to five days at one point in time during this examination here. Quite frankly, looking at the video, that belies that characterization, and so I'm inclined to disbelieve that at this stage.

Were there any physical or mental coercion; I heard the officers, all of them, talk very calmly to him, very much like Detective Massey described on the initial interview.

I heard Detective Massey testify about his tone. He said it was all conversational. That was in October and also throughout the course of this videotape. Again, there is no showing of any coercion during that time gap that I thought we were going to talk about here wherein Detective Massey didn't have the video rolling. I just find that there's no proof of that, no proof of any threats or promises or inducements.

Indeed on the video itself, I find specifically that Mr. Smith repeatedly said this is up to the district attorney general. You know, maybe if you want counseling, you can get that, maybe you can, but all of that is between you and the district attorney general. I cannot promise you anything. That is clearly on the video. I find no reason to think that it would not be in this time gap which I've heard no proof about any coercion anyway at that statement.

And to the extent that the police used deceit or trickery, I heard Detective Massey repeatedly say and also Mr. Smith say first off and formost [sic] that a polygraph is a tool; it's an investigative tool, and that's all it is, because the reason they called both of these individuals in, they were the only ones that had exclusive care and control over the child, and there was no question about that.

33

The difference between October 4th and the 19th of October is some two weeks. This interrogation, if you will, and I can find – I could find that it was in custody. I'm assuming that the gentleman was free to leave because this is a sealed indictment. He left that day. I can only conclude that because in the Court file itself, there was no warrant issued that day and he left that day. He said he left after his girlfriend came to get him.

So that even further supports the concept that he was free to go, although we could call it a custodial interrogation. I'm not at all certain that it was that, but I'm going to call it for the purpose of this ruling that, but that's -- to a certain extent, is somewhat belied by the circumstances that I've heard.

Police used deceit or trickery; quite frankly, they were pretty candid with him, said the test shows that you were deceptive; the test shows that you're not being truthful, and I want you to go ahead and come clean because before the district attorney general can make a decision about this case. He has to have all the facts. If that's deceit or trickery, that's something novel to me.

So, with regard to whether or not the doctor's testimony would assist the trier of fact at this stage and whether or not he's susceptible to coercion or that sort of thing, I find that there's no showing of this at all, no showing of this at all.

So accordingly, with all due respects, Mr. Love, I'm going to deny your request to call the doctor as to the voluntariness of this because there has been no showing of coercion at all in this case, and I think I need to at least see that before I can even get into this susceptibility aspect.

The Defendant then made an offer of proof with respect to Dr. Montgomery's testimony.

After review, we cannot conclude that the trial court abused its discretion. After a very specific and detailed finding that there was no coercion, the trial court concluded that information about the Defendant's susceptibility to coercion would not "substantially assist the trier of fact." In our view, the trial court did not abuse its discretion by declining to admit Dr. Montgomery's testimony into evidence. The Defendant is not entitled to relief as to this issue.

**D. Suppression of the October 19, 2012 Statement**

34

The Defendant contends that his October 19, 2012 statement was the result of police coercion and therefore not voluntary. The State responds that the trial court properly found no evidence of police misconduct or coercion to warrant suppression of the Defendant's statement. We agree with the State.

Our standard of review for a trial court's findings of fact and conclusions of law on a motion to suppress evidence is set forth in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id*. at 23. As is customary, "the prevailing party in the trial court is afforded the strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). Nevertheless, this Court reviews *de novo* the trial court's application of the law to the facts, without according any presumption of correctness to those conclusions. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence, and resolve any conflicts in the evidence. *Odom*, 928 S.W.2d at 23. In reviewing a trial court's ruling on a motion to suppress, an appellate court may consider the evidence presented both at the suppression hearing and at the subsequent trial. *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

"Confessions that are involuntary, i.e., the product of coercion, whether it be physical or psychological, are not admissible." *State v. Phillips*, 30 S.W.3d 372, 376 (Tenn. Crim. App. 2000) (*citing Rogers v. Richmond*, 365 U.S. 534, 540 (1961)). In order to make the determination of whether a confession was voluntary, the particular circumstances of each case must be examined. *Id*. at 377 (*citing Monts v. State*, 400 S.W.2d 722, 733 (1966)). "Coercive police activity is a necessary prerequisite in order to find a confession involuntary." *Id*. (*citing State v. Brimmer*, 876 S.W.2d 75, 79 (Tenn. 1994)). "The crucial question is whether the behavior of the state's officials was 'such as to overbear [defendant]'s will to resist and bring about confessions not freely self-determined.'" *Id.* (quoting *Rogers*, 365 U.S. at 544); *see State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980).

The evidence presented at the hearing does not preponderate against the trial court's finding that the Defendant's statement was given voluntarily. The evidence presented by the State at the suppression hearing was the video recording and Detective Massey's testimony. Detective Massey testified that he advised the Defendant of his *Miranda* rights, and the Defendant's signed waiver of those rights was introduced. In the recording, the Defendant appears to be willing to talk to investigators and continued to do

so without any suggestion that he did not wish to be questioned or that he wanted the interview to end. Throughout the recording, there was no indication by the Defendant that he was not participating in the interview voluntarily. Furthermore, the Defendant willingly came to the police station by his own means of transportation. Once at the station, he was offered and took multiple breaks.

The Defendant has not presented evidence to show that the officers' questions or tactics, reviewed in the totality of the circumstances, were such as to overbear the Defendant's will to bring about a statement that was the product of coercion. The Defendant gave his statement after being read his *Miranda* rights. He was not mistreated, threatened, or treated disrespectfully by the questioning officers. We conclude, as did the trial court, that the Defendant's statement was voluntarily given. The Defendant is not entitled to relief as to this issue.

### E. Sufficiency of the Evidence

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of

36

witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn.1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

Child abuse occurs when a person "knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury." T.C.A. § 39-15-401(a) (2014). A person commits aggravated assault if he or she "[i]ntentionally or knowingly commits an assault as defined in § 39-13-101 and: (A) Causes serious bodily injury to another; or (B) Uses or displays a deadly weapon." T.C.A. § 39-13-102(a) (2014). Tennessee Code Annotated section 39-13-101(a) (2014) states that a person commits assault if he or she: "(1) Intentionally, knowingly or recklessly causes bodily injury to another; (2) Intentionally or knowingly causes another to reasonably fear imminent bodily injury; or (3) Intentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative." "'Serious bodily' injury means bodily injury that involves: [a] substantial risk of death; [p]rotracted unconsciousness; [e]xtreme physical pain; [p]rotracted or obvious disfigurement; or [p]rotracted loss or substantial impairment of a function of a bodily member, organ or mental faculty; or [a] broken bone of a child who is twelve (12) years of age or less[.]" T.C.A. § 39-11-106(a)(34)(A)-(F) (2014).

The evidence, viewed in the light most favorable to the State, showed that the Defendant and N.S. were the sole caretakers of the one-month-old victim. By all accounts, the Defendant was not working at the time and, therefore, solely cared for the victim while N.S. worked. The victim became fussy and both the Defendant and N.S. admitted to becoming frustrated with the victim. One of N.S.'s co-workers testified about a conversation with N.S., during which N.S. disclosed the Defendant's frustration with the victim's crying. After concern over what presented as "acid reflux," x-rays revealed numerous fractures throughout the victim's body, who was by that time two-months old. Dr. Lowen testified about the twenty-three fractures in various stages of healing to the victim's rib cage, legs, and arms and opined that the injuries were sustained through abuse. The Defendant admitted to the police that he handled the victim roughly when frustrated and even heard a "pop" during one such incident. This evidence is sufficient from which the jury could conclude the Defendant inflicted injury upon the child and caused the two-month-old victim to sustain twenty-three fractures throughout his body.

We agree that no direct evidence at trial linked the Defendant to these injuries. No one testified that they saw the Defendant cause the injuries to the victim. The case against the Defendant was based upon circumstantial evidence, however, "[a] criminal offense may be established exclusively by circumstantial evidence." *State v. Raines*, 882 S.W.2d 376, 380 (Tenn. Crim. App. 1994). The evidence presented against the Defendant was that he was the sole caretaker of the victim while N.S. worked, he was frustrated with the victim at times and handled him roughly, and he heard a "pop" consistent with the sound of a bone breaking. The only other possible perpetrator was N.S., and the jury heard N.S. testify that she did not harm the victim. Further, she was the sole income provider at the time, leaving the Defendant exclusively in control of the victim while she was at work. It is within the jury's purview to make credibility determinations, and the jury credited the testimony of N.S. that she did not harm the victim.

Accordingly, we conclude that there is sufficient evidence to convict the Defendant of aggravated assault and child abuse. The Defendant is not entitled to relief as to this issue.

### F. Improper Impeachment of the Defendant's Character

The Defendant asserts that the trial court failed to follow the proper procedure, pursuant to Tennessee Rule of Evidence 405, for admission of character evidence. Specifically, the Defendant argues that the trial court's failure to find a reasonable factual basis for the inquiry into an alleged statement by the Defendant about the victim is error. The State responds that the Defendant has waived this issue for failing to challenge the

factual basis for the State's inquiry or challenging the testimony as hearsay and, alternatively, that any error was harmless.

Rule 404(a)(1) of the Tennessee Rules of Evidence allows the introduction of "[e]vidence of a pertinent character trait offered by the accused or by the prosecution to rebut the same." Rule 405 of the Tennessee Rules of Evidence deals with methods of proving character and allows proof to be presented by "testimony as to reputation or by testimony in the form of an opinion." Tenn. R. Evid. 405(a). Rule 405 provides for a character witness being cross-examined about "relevant specific instances of conduct" on the part of the person whose character is at issue. *Id*. The rule contemplates a jury-out hearing, if requested, after which the trial court must determine that a reasonable factual basis exists for the inquiry and that the probative value of a specific instance of conduct on the character witness's credibility outweighs its prejudicial effect on substantive issues. *See* Tenn. R. Evid. 405(a)(1)-(3).

In the present case, the "application to the court," contemplated by Rule 405 consisted of the prosecuting attorney requesting a jury-out hearing to alert the court of its intent to ask the witness, Ms. Crawford, about the Defendant's admissions to the police about aggressive behavior toward the victim and N.S.'s statement to a co-worker about the Defendant's statement that the victim needed to "man up." The Defendant's attorney argued that both instances were not relevant and prejudicial. The trial court responded that Ms. Crawford's testimony "put the issue of character squarely at issue." The trial court went on to state that, "I'll make a specific finding, sir, that the probative value is not substantially outweighed by the danger of unfair prejudice." No determination was made by the trial court that a reasonable factual basis for the inquiry existed. Further, we also note that in stating its finding regarding the probative value the trial court used an incorrect standard. Rule 405 requires that the probative value of the conduct on the character witness's credibility outweigh its prejudicial effect on substantive issues.

In the present case, the Defendant was attempting to show through character witnesses that he was not a violent person. Therefore, the "[e]vidence of a pertinent character trait" contemplated by Rule 404(a)(1) in this case is the trait of being non-violent. It is important to note that in cross-examining a character witness about a specific act of the accused, the specific act must be relevant to the character trait about which the witness has testified. *State v. Nesbit*, 978 S.W.2d 872, 881 (Tenn.1998). In the present case, the character witness was cross-examined about her awareness of the Defendant's admissions about being frustrated and rough with the victim and his statement "calling the [victim] a pussy and that he, the [victim], needed to man up."

A second character witness, the Defendant's mother, was also cross-examined about the Defendant's statements to police and his statements to N.S. about the victim

being a "pussy" and needing to "man up."  As was the case with Ms. Crawford, the Defendant's mother testified on direct that the Defendant was not a violent person.  The trial court gave no contemporaneous jury instruction pertaining to the cross-examination of either the Defendant's sister or the Defendant's mother.  The instruction, however, was later given by the court as part of the jury instructions at the conclusion of the evidence.

Although the trial court did not follow the exact procedures set forth in Rule 405(a), any error by the trial court pertaining to Rule 405(a) was harmless error.  The State sought the trial court's permission before questioning the character witness about the Defendant's alleged statements about the victim.  The trial court held a hearing outside the jury's presence to consider the issue.  The specific instance of conduct about which inquiry was proposed was relevant to the issue about which the witness had testified—the Defendant's reputation in the community for peacefulness.  The State identified the source of the specific instance of conduct on the record at the jury-out hearing.  A review of the record does not demonstrate that the prejudicial effect of the specific instance of conduct on the substantive issues outweighed its probative impeachment value.  The inquiry was directly relevant to the character traits of peacefulness about which the witnesses had testified.  In its final charge, the trial court properly instructed the jury as to the permissible limited use of the evidence.  The jury is presumed to have followed those instructions.  *State v. Walker*, 910 S.W.2d 381, 397 (Tenn. 1995); *State v. Lawson*, 695 S.W.2d 202, 204 (Tenn. Crim. App. 1985).  Accordingly, the Defendant is not entitled to relief.

### G. Election of Offenses

The Defendant argues that the State did not sufficiently make an election of offenses to ensure a unanimous verdict.  The State responds that the Defendant did not object to the State's election at trial and has, therefore, waived our review.  We agree with the State.

In Tennessee, "no issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived . . . ."  Tenn. R. App. P. 3(e); *State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010); *State v. Keel*, 882 S.W.2d 410, 416 (Tenn. Crim. App. 1994).  As discussed previously in this opinion, we may review an issue which would ordinarily be considered waived if the Court finds plain error in the record.  *See* Tenn. R. App. P. 36(b).

The Tennessee Supreme Court "has consistently held that the prosecution must elect the facts upon which it is relying to establish the charged offense if evidence is introduced at trial indicating that the defendant has committed multiple offenses against

the victim." *State v. Johnson*, 53 S.W.3d 628, 630 (Tenn. 2001) (citing *State v. Kendrick*, 38 S.W.3d 566, 568 (Tenn. 2001); *State v. Brown*, 992 S.W.2d 389, 391 (Tenn. 1999); *State v. Walton*, 958 S.W.2d 724, 727 (Tenn. 1997); *Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996); *State v. Shelton*, 851 S.W.2d 134, 137 (Tenn. 1993)). "The election requirement safeguards the defendant's state constitutional right to a unanimous jury verdict by ensuring that jurors deliberate and render a verdict based on the same evidence." *Johnson*, 53 S.W.3d at 631 (citing *Brown*, 992 S.W.2d at 391). The right to a unanimous verdict "requires the trial court to take precautions to ensure that the jury deliberates over the particular charged offense, instead of creating a 'patchwork verdict' based on different offenses in evidence." *Kendrick*, 38 S.W.3d at 568 (quoting *Shelton*, 851 S.W.2d at 137).

Our Supreme Court, however, acknowledged that "there is no right to a perfect election," and that the election requirement may be satisfied in different ways. *State v. Knowles*, 470 S.W.3d 416, 424 (Tenn. 2015). The *Knowles* Court stated as follows:

> [I]n *State v. Shelton*, this Court detailed how the State may sufficiently elect a particular offense in a sex crimes case. While the *Shelton* Court held that merely specifying a span of days wherein the abuse was alleged to have occurred was not a sufficient election, the Court emphasized that "the [S]tate is not required to identify the particular date of the chosen offense" and noted that "a particular offense can often be identified without a date." *Shelton*, 851 S.W.2d at 137. In the absence of electing a specific date, the prosecutor may "identify a particular type of abuse and elect that offense" if the victim suffered multiple types of abuse. *Id*. at 138. . . . Ultimately, this Court in *Shelton* concluded that "[a]ny description that will identify the prosecuted offense for the jury is sufficient." *Id*.

In this case, the victim was a two-month-old victim and, therefore, unable to speak for himself. The duration of the Defendant's caretaking of the victim was from August 31 to October 4, 2012, a relatively brief period of time. The State did not provide a specific date, but specified injuries based on degree of healing. Dr. Lowen testified about the various stages of healing visible in the twenty-three fractures and provided time frames in which the fractures were likely sustained. The State elected only two offenses. One offense was based upon the "old" fractures showing more than seven days of healing, and one offense was based upon the "new" fractures, indicating injuries that had occurred within seven days. In our view, this description "adequately describes the prosecuted offense for the jury," *Shelton*, 851 S.W.2d at 138. Therefore, the Defendant has not shown that a clear and unequivocal rule of law was violated and, thus, plain error review is not warranted. The Defendant is not entitled to relief as to this issue.

## H. Cumulative Error

The Defendant contends that he is entitled to a new trial based upon the cumulative effect of errors that occurred. The cumulative error doctrine is a judicial recognition that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial. *State v. Hester*, 324 S.W.3d 1, 77 (Tenn. 2010). To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings. *State v. Odom*, 137 S.W.3d at 605; *see State v. Guy*, 165 S.W.3d 651, 667 (Tenn. Crim. App. 2004); *State v. Mickens*, 123 S.W.3d 355, 397 (Tenn. Crim. App. 2003).

The trial court erred in following the procedure provided in Tennessee Rule of Evidence 405. We conclude that the evidence of the Petitioner's guilt was strong, and the cumulative effect of the errors is still harmless. The Petitioner was not deprived of his right to a fair trial and, therefore, is not entitled to relief on this issue.

## I. Consecutive Sentencing

The Defendant asserts that the trial court improperly found that the Defendant was a "dangerous offender" pursuant to Tennessee Code Annotated section 40-35-115(b)(4), as a basis for ordering consecutive sentences. The State responds that the trial court properly imposed consecutive sentencing in this case. We agree with the State.

It is within the sound discretion of the trial court whether or not an offender should be sentenced consecutively or concurrently. *State v. James*, 688 S.W.2d 463, 465 (Tenn. Crim. App. 1984). A court may order multiple sentences to run consecutively if it finds, by a preponderance of the evidence, that at least one of the following seven factors exists:

(1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of the defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

T.C.A. § 40-35-115(b)(1)-(7). In addition to these criteria, consecutive sentencing is subject to the general sentencing principle that the length of a sentence should be "justly deserved in relation to the seriousness of the offense" and "no greater than that deserved for the offense committed." T.C.A. § 40-35-102(1), 103(2*); see also State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002).

In this case, the trial court found, "[t]he [D]efendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." T.C.A. § 40-35-115(4) (2014). Our supreme court has noted that the "dangerous offender" category is the hardest and most subjective to apply. *State v. Lane*, 3 S.W.3d 456, 460 (Tenn. 1999). Consequently, our supreme court in *State v. Wilkerson* held that "particular facts" must show the following in order to base consecutive sentencing on subsection 115(b)(4): (1) that an extended sentence is necessary to protect the public against further criminal conduct by the defendant; and (2) that the consecutive sentences reasonably relate to the severity of the offenses committed. 905 S.W.2d 933, 938-39 (Tenn. 1995); *see State v. Robinson*, 146 S.W.3d 469, 524 (Tenn. 2004).

We conclude that the evidence supports the trial court's imposition of consecutive sentences. The evidence proved that the Defendant, the two-month-old victim's caretaker, was frustrated with the victim's fussiness and was rough with the victim. The victim sustained twenty-three fractures throughout his body. The Defendant, even though he admitted to hearing a "pop" when aggressively handling the infant, never sought medical attention to determine if the "pop" had caused damage because he was

43

afraid of being accused of abuse. The Defendant, at the time of trial, had a one-year-old child and N.S. was pregnant with a second child. The trial court considered the significance of the numerous fractures within a short period of time and expressed concern that the maximum ten-year sentence he could impose was not sufficient in light of the Defendant's crimes in implicitly concluding that the ten-year sentence "reasonably related" to the offenses. The trial court also specifically found that it was necessary to protect the public from further criminal conduct and, "in particular, any young child that [the Defendant] might come in contact with."

Accordingly, we conclude that the record demonstrates that consecutive sentencing was appropriate in this case and that the trial court did not abuse its discretion when it imposed consecutive sentences. The Defendant is not entitled to relief.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, the judgments of the trial court are affirmed.

_____
ROBERT W. WEDEMEYER, JUDGE